## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JOSE J. GARCIA,

      Petitioner,

v.                                Case No. 8:19-cv-659-CEH-AEP

SECRETARY, DEPARTMENT
OF CORRECTIONS.

      Respondent.

_____/

## O R D E R

Jose J. Garcia petitions for a writ of habeas corpus under 28 U.S.C. § 2254 and challenges his state court convictions for possession of child pornography. (Doc. 1)  The respondent argues that Ground Three is unexhausted and procedurally barred from federal review.  (Doc. 8 at 5, 14–16)  Upon review of the petition, the response, and the relevant state court record (Doc. 8), the petition will be denied.

## PROCEDURAL HISTORY

An information charged Garcia with one hundred counts of possession of child pornography.  (Doc. 8-2 at 2–84)  Each count in the information charged a sentencing reclassification under Section 775.0847(2), Florida Statutes, for the possession of ten or more images with at least one image containing a child younger than five, sadomasochistic abuse, a sexual battery, sexual bestiality, or a movie involving a child. (Doc. 8-2 at 2–84)  Garcia pleaded guilty to twenty counts in exchange for the prosecutor's agreement to dismiss the remaining eighty counts and recommend a

1

sentence that did not exceed thirty years of prison.  (Doc. 8-2 at 86–89, 93–94)  Garcia

and the prosecutor stipulated to the following factual basis (Doc. 8-2 at 98–99):

> [Prosecutor:]  Beginning in July of 2010, law enforcement officers with the Internet Crimes Against Children task force located in West Palm Beach began an online investigation for an IP address that ultimately belonged to a Jose Jorge Garcia. During that investigation, they noticed that [the] IP address had been trading in child pornography and ultimately drew up a search warrant and brought it to a magistrate for approval.
>
> That search warrant was executed at the residence belonging to Jose Jorge Garcia in Dover, Florida in Hillsborough County, and that was executed August 13th, 2010, at which point multiple items of electronics were taken from the home and analyzed by the Florida Department of Law Enforcement and the Office of the Attorney General.
>
> The forensic review of those computers, including a Western Digital external hard drive, contained images of child pornography, of children under the age of 12 engaged in sexual conduct. Mr. Garcia was interviewed and said he was the person who chatted with the undercover officer believing him to be a sexual predator. This offense occurred in Hillsborough County. He can be identified by witnesses.

The trial court sentenced Garcia to 15 years of prison for nineteen counts and a

consecutive 15 years of prison for a twentieth count, resulting in an aggregate

thirty-year sentence.  (Doc. 8-2 at 106–31, 258)  Garcia appealed, and the state

appellate court affirmed. *Garcia v. State*, 132 So. 3d 232 (Fla. 2d DCA 2014) (table).

The state post-conviction court denied Garcia relief after an evidentiary hearing (Doc.

8-6 at 2–17, 81–95), and the state appellate court affirmed.  *Garcia v. State*, 262 So. 3d

710 (Fla. 2d DCA 2018) (table).  Garcia's federal petition follows.

## GOVERNING LEGAL PRINCIPLES

**AEDPA**

Because Garcia filed his federal petition after the enactment of the Antiterrorism

and Effective Death Penalty Act of 1996, AEDPA governs the review of his claims.

*Lindh v. Murphy*, 521 U.S. 320, 336–37 (1997).  AEDPA amended 28 U.S.C. § 2254(d)

to require:

> An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim —
>
> (1)   resulted in a decision that was contrary to, or
>        involved an unreasonable application of, clearly
>        established Federal law, as determined by the
>        Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an
>        unreasonable determination of the facts in light of
>        the evidence presented in the State court
>        proceeding.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000) interprets this constraint on

the power of the federal habeas court to grant a state prisoner's petition:

> Under the "contrary to" clause, a federal habeas court may grant
> the writ if the state court arrives at a conclusion opposite to that
> reached by this Court on a question of law or if the state court
> decides a case differently than this Court has on a set of
> materially indistinguishable facts. Under the "unreasonable
> application" clause, a federal habeas court may grant the writ if

> the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Clearly established federal law refers to the holding of a U.S. Supreme Court's opinion at the time of the relevant state court decision. *Williams*, 529 U.S. at 412.

"[A]n unreasonable application of federal law is different from an *incorrect* or *erroneous* application of federal law." *Williams*, 529 U.S. at 412 (italics in original). Even clear error is not enough. *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). "This is 'meant to be' a difficult standard to meet." *LeBlanc*, 137 S. Ct. at 1728 (quoting *Richter*, 562 U.S. at 102).

A factual determination by the state court is not unreasonable "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). A federal habeas court may grant relief only if "in light of the evidence presented in the state court proceedings, no reasonable jurist would agree with the factual determinations upon which the state court decision is based." *Raleigh v. Sec'y, Fla. Dep't Corrs.*, 827 F.3d 938, 948–49 (11th Cir. 2016). A state court's factual determination is presumed correct, and a petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 694 (2002). Consequently, "review under [Section] 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011). *Accord Landers v. Warden, Att'y Gen. of Ala.*, 776 F.3d 1288, 1294–95 (11th Cir. 2015) (applying *Pinholster* to Section 2254(d)(2)).

If the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons in the opinion and defers to those reasons if reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). If the last state court decision is without reasons, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Id.* at 1192.

**Ineffective Assistance of Counsel**

Garcia asserts ineffective assistance of counsel — a difficult claim to sustain. *Strickland v. Washington*, 466 U.S. 668, 687 (1984) explains:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"There is no reason for a court deciding an ineffective assistance of counsel claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

"During plea negotiations defendants are 'entitled to the effective assistance of competent counsel.'" *Lafler v. Cooper*, 566 U.S. 156, 162 (2012) (citation omitted). "[W]hen a defendant claims that his counsel's deficient performance deprived him of a trial by causing him to accept a plea, the defendant can show prejudice by demonstrating a 'reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *Lee v. United States*, 137 S. Ct. 1958, 1965 (2017) (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690–91. Because the standards under *Strickland* and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*,

562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'" *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (quoting *Johnson v. Sec'y, Dep't Corrs.*, 643 F.3d 907, 911 (11th Cir. 2011)).

**Exhaustion and Procedural Default**

A petitioner must exhaust the remedies available in state court before a federal court can grant relief on federal habeas. 28 U.S.C. § 2254(b)(1)(A). The petitioner must (1) alert the state court to the federal nature of his claim and (2) give the state court one full opportunity to resolve the federal claim by invoking one complete round of the state's established appellate review process. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Picard v. Connor*, 404 U.S. 270, 278 (1971). The state court must have the first opportunity to review and correct any alleged violation of a federal right. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

A federal court may stay — or dismiss without prejudice — a habeas case to allow a petitioner to return to state court to exhaust a claim. *Rhines v. Weber*, 544 U.S. 269 (2005); *Rose v. Lundy*, 455 U.S. 509 (1982). If the state court would deny the claim on state procedural grounds, the federal court instead denies the claim as procedurally barred. *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)). A petitioner may excuse a procedural default on federal habeas by (1) showing cause for the default and actual prejudice from the

alleged violation of federal law or (2) demonstrating a miscarriage of justice. *Maples v. Thomas*, 565 U.S. 266, 280 (2012); *House v. Bell*, 547 U.S. 518, 536–37 (2006).

ANALYSIS

**Ground One and Ground Two**

In Ground One, Garcia asserts that trial counsel was ineffective for misadvising him to plead guilty, without an agreement, to twenty counts of possession of child pornography resulting in multiple convictions and sentences arising from a "single quantum of illicit images found during a single search [and] criminal episode." (Doc. 1 at 6)  He contends that the multiple convictions and sentences violate double jeopardy. (Doc. 1 at 6)

In Ground Two, Garcia asserts that trial counsel was ineffective for not moving to dismiss the charges arising from the same criminal episode and misadvising Garcia to plead guilty without an agreement to the twenty counts arising from the same criminal episode. (Doc. 1 at 8)  He contends that trial counsel was further ineffective for misadvising him to plead guilty even though the prosecution unlawfully manipulated his sentence by charging multiple offenses for the same crime and violated a sentencing enhancement statute which authorizes a single criminal violation for possession of ten or more images. (Doc. 1 at 8)

**Double Jeopardy**

The state post-conviction court denied the double jeopardy claim as follows (Doc. 8-6 at 5–7) (state court record citations omitted):

. . . Defendant alleges the Court's imposition of multiple convictions and sentences under section 775.0847 stemming from a single quantum of illicit images violated double jeopardy protections and due process guarantees of the Fifth Amendment of the United States Constitution. Specifically, he alleges he entered a "best interest" open plea with a negotiated cap of 30 years and was convicted and sentenced on twenty counts reclassified under sections 775.0847(2) and (3), Florida Statutes. He alleges said convictions and sentences were in contravention of the plain language of the statute which itself was devoid of any legislative intent authorizing multiple convictions and sentences for the same offense in violation of double jeopardy protections. He further alleges he never expressly waived double jeopardy.

He alleges his twenty convictions and sentences pursuant to section 775.0847, Florida Statute[s,] were not authorized by the plain "10 or more" language of the reclassification statute and thus, resulted in a violation of double jeopardy. Therefore, he alleges only one conviction and sentence could be imposed and supported by the entirety of images found in Defendant's possession once the statute's one-time requirement for reclassification of the base offense was met for the first time. He alleges to read the statute any other way would be to punish him twenty times for a one-time crossing the "10 or more" bright line established by the legislature in the plain and unambiguous language of the statute.

Defendant further alleges the application of section 775.0847(2) creates a new substantive offense by adding "two additional elements" beyond those found in section 827.071(5)(a), thereby achieving the legislative intent to effect a three-fold enhancement of the prescribed punishment from five to fifteen years' incarceration based upon the two additional elements added to the offense by the reclassification statute. Therefore, he alleges in this particular case, according to the plain language of section 775.0847, once a defendant is found to possess "l0 or more images of any form of child pornography," a one-time reclassification is mandated, and any reclassifications would expose said defendant to double jeopardy by imposing multiple punishments for a single crossing of the same threshold bright line of "10 images." He alleges the charges brought against him in this case arose from a single collection of illicit images that were discovered during a single search or criminal episode, and the State, having the option to charge Defendant with the base offense, elected to charge him under sections 775.0847(2) and (3), and therefore, only one conviction could be supported

without violating double jeopardy. Consequently, Defendant alleges the judgment and sentences for counts eighty-two through one hundred should be vacated in their entirety and he should be set for resentencing before a different judge.

After reviewing the allegations, the court file, and the record, the Court finds on January 30, 2012, Defendant entered a plea based on negotiations with the State whereby Defendant agreed to enter the plea to twenty counts of possession of child pornography (ten or more images and content of images) (counts eighty-one through one hundred) with a thirty year prison cap, and in exchange, the State agreed to *nolle prosequi* eighty counts of possession of child pornography (ten or more images and content of images) (counts one through eighty). The Court finds Defendant asserts section 775.0847 required the State to charge the total number of images arising from the single criminal episode totaling ten or more as one single offense. Therefore, Defendant asserts he could not be convicted for more than one count of possession of child pornography (10 or more images) and the Court violated double jeopardy.

However, the Court finds section 827.071(5) states:

> It is unlawful for any person to knowingly possess a photograph, motion picture, exhibition, show, representation, or other presentation which, in whole or in part, he or she knows to include any sexual conduct by a child. The possession of each such photograph, motion picture, exhibition, show, representation, or presentation is a separate offense. Whoever violates this subsection is guilty of a felony of the third degree, punishable as provided in section 775.082, section 775.083 , or section 775.084.

§ 827.071(5), Fla. Stat. (2009). Therefore, the Court finds this is not double jeopardy. The Court finds the State could have charged each of the 200 images as a separate count. The Court finds as third-degree felonies, Defendant would have been facing up to 1000 years prison. The Court finds "[s]ection 775.0847 does not constrain the State's charging discretion." *Walsh v. State*, [ ] 2016 WL 833583 [at] *1 (Fla. 2d DCA Mar. 4, 2016). The Court finds "section 775.0847 allows the State to reclassify violations of section 827.071 to second-degree felonies if the offender possesses ten or more images and the content of at least one image contains at least one of the types of images listed in

the statute." *Id.* Therefore, the Court finds when read together, both "statutes contemplate a possible separate charge for each image and allow for an upward reclassification if the number of images totals ten or more." *Id.* The Court finds section 775.0847 does not require the State to confine the charges to one offense per ten images in order to reclassify. The Court finds the State could have charged him with 200 second-degree felonies. The Court finds Defendant benefitted from the State charging only one offense for each group of ten images. Therefore, the Court finds no double jeopardy violation occurred. As such, no relief is warranted [ ].

"Generally, entering a guilty plea waives a defendant's right to all non-jurisdictional challenges to a conviction." *United States v. Bonilla*, 579 F.3d 1233, 1240 (11th Cir. 2009). However, "'[w]here the State is precluded by the United States Constitution from haling a defendant into court on a charge, federal law requires that a conviction on that charge be set aside even if the conviction was entered pursuant to a counseled plea of guilty.'" *Bonilla*, 579 F.3d at 1240 (quoting *Menna v. New York*, 423 U.S. 61, 62 (1975)). "'[A] defendant does not waive a double jeopardy challenge when, judged on the basis of the record that existed at the time the guilty plea was entered, the second count is one the government may not constitutionally prosecute.'" *Bonilla*, 579 F.3d at 1240 (quoting *United States v. Smith*, 532 F.3d 1125, 1127 (11th Cir. 2008)). *United States v. Broce*, 488 U.S. 563, 575 (1989) ("'We do not hold that a double jeopardy claim may never be waived. We simply hold that a plea of guilty to a charge does not waive a claim that — judged on its face — the charge is one which the State may not constitutionally prosecute.'") (quoting *Menna*, 423 U.S. at 63 n.2).

Garcia pleaded guilty to count 81 through count 100 in the information. (Doc. 8-2 at 93, 95)  Each count in the information contained identical language, charged

crimes under the same statutes, and alleged criminal conduct occurring on the same date.  (Doc. 8-2 at 54–63)  At the change of plea hearing, Garcia and the prosecutor stipulated to a factual proffer which stated that Garcia possessed images of child pornography but did not specify the number of images that Garcia possessed.  (Doc. 8-2 at 98–99)  Neither the information nor the factual proffer demonstrates that Garcia pleaded guilty to the twenty counts based on twenty separate images. However, because the double jeopardy claim can be resolved on the face of the record, Garcia did not waive his double jeopardy challenge by pleading guilty, and the Court must address the merits of the double jeopardy claim. *United States v. Kaiser*, 893 F.2d 1300, 1303 (11th Cir. 1990).

"The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution prohibits successive prosecution or multiple punishment for 'the same offence.'" *Witte v. United States*, 515 U.S. 389, 391 (1995).  "[T]he double jeopardy prohibition of the Fifth Amendment . . . appl[ies] to the States through the Fourteenth Amendment." *Benton v. Maryland*, 395 U.S. 784, 794 (1969).

"The protection against multiple punishments is 'designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature.'" *Kaiser*, 893 F.2d at 1304 (citing *Ohio v. Johnson*, 467 U.S. 493, 499 (1984)).  "If the statutes under which the defendant was sentenced specifically authorize cumulative punishments for the same offense, a court may impose cumulative punishment without running afoul of the Double Jeopardy Clause." *Kaiser*, 893 F.2d at 1304.  "If, however, the statute does not clearly authorize cumulative punishment, then the court

must apply the test set out in *Blockburger v. United States*, 284 U.S. 299, 304 (1932), to determine if the offenses are sufficiently distinguishable to permit the imposition of cumulative punishment." *Kaiser*, 893 F.2d at 1304 (citations omitted). *Williams v. Singletary*, 78 F.3d 1510, 1513 (11th Cir. 1996) (requiring a federal habeas court to examine relevant statutes under *Blockburger* only after first "ascertain[ing] whether there exists a clear legislative intent to impose cumulative punishments, under separate statutory provisions, for the same conduct"). *Accord Missouri v. Hunter*, 459 U.S. 359, 368–69 (1983) ("Where . . . a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the 'same' conduct under *Blockburger*, a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.").

The information charged Garcia with violating Sections 827.071(5) and 775.0847(2) and (3), Florida Statutes. (Doc. 8-2 at 17–20) Section 827.071(5) criminalizes the possession of child pornography and punishes as a separate offense "[t]he possession, control, or intentional viewing of **each such** photograph, motion picture, exhibition, show, image, data, computer depiction, representation, or presentation." § 827.071(5), Fla. Stat. (bolding added).

The statute directs that: "A person who violates this subsection commits a felony of the third degree, punishable as provided in section 775.082, section 775.083, or section 775.084." § 827.071(5)(a), Fla. Stat. Section 775.082 provides that a third-degree felony is punishable by five years of prison. § 775.082(3)(e), Fla. Stat.

Section 775.0847 reclassifies the crime to a second-degree felony, punishable by fifteen years, if the defendant possesses ten or more images of child pornography and at least one image contains aggravated content enumerated in the statute. § 775.0847(2), Fla. Stat.

Plain and unambiguous language in Section 827.071(5) authorizes multiple punishment for the same offense. Interpreting Section 827.071(5) and 775.0847(2), *Walsh v. State*, 198 So. 3d 783, 785 (Fla. 2d DCA 2016) (citations omitted) (bolding added) concludes that Section 775.0847(2) does not constrain that authorization:

> Section 775.0847 does not constrain the State's charging discretion. Rather, section 775.0847 allows the State to reclassify violations of section 827.071 to second-degree felonies if the offender possesses ten or more images and the content of at least one image contains at least one of the types of images listed in the statute. Read together, the statutes contemplate a possible separate charge for each image and allow for upward reclassification if the number of images totals ten or more. **Section 775.0847 does not require the State, as it did here, to limit the charges to one offense per ten images in order to reclassify.**

"'A federal court applying state law is bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise.'" *Williams*, 78 F.3d at 1515 (quoting *Silverberg v. Paine, Webber, Jackson & Curtis, Inc.*, 710 F.2d 678, 690 (11th Cir. 1983)). *See also Taylor v. State*, 267 So. 3d 1088, 1091 (Fla. 5th DCA 2019) ("[T]he plain language of sections 775.0847(2) and 827.071(5)(a) outlines a clear legislative directive. Read together, those sections authorize a separate charge for each violation of section 827.071(5) and permit the State to reclassify each violation if the offender possesses

ten or more images and the statutory criteria set forth in section 775.0847(2)(b) are satisfied."); *Pardue v. State*, 176 So. 3d 340, 342 (Fla. 1st DCA 2015) ("As the language of the [Section 827.071(5)(a), Florida Statutes,] clearly indicates, each depiction of a child engaged in sexual conduct is to be punished separately . . . .").

Garcia's reliance on *Chesser v. State*, 148 So. 3d 497 (Fla. 2d DCA 2014) in his state post-conviction motion (Doc. 8-4 at 13–15) and *United States v. Elliott*, 937 F.3d 1310 (10th Cir. 2019) in his supplemental authority notice (Doc. 10) is misplaced. *Chesser*, 148 So. 3d at 498–99, held that the Florida legislature did not intend multiple convictions for a violation of subsection (4) of Section 827.071, which does not contain specific language criminalizing "[t]he possession of each such photograph, motion picture, exhibition, show, representation, or presentation" as a separate offense. Likewise, *Elliott*, 937 F.3d at 1313–14, concluded that Congress did not intend for multiple convictions of 18 U.S.C. § 2252A(a)(5)(B), which criminalizes "knowingly possesses[ing] . . . any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography." In contrast, Garcia pleaded guilty to multiple convictions for a violation of subsection (5), Section 827.071, which does contain specific language indicating legislative intent for multiple convictions under the same statute. § 827.071(5), Fla. Stat. *See Pardue*, 176 So. 3d 340, 342 ("[W]hile section 827.071(4) prohibits possession with intent to promote 'any' depiction, section 827.071(5)(a) prohibits 'a' depiction and 'each' depiction. The use of 'any' indicates legislative intent to create a single unit of prosecution; 'a' indicates an intent to provide for separate offenses.").

Because Section 827.071(5) plainly and unambiguously authorizes multiple punishment for the same offense, the state court did not unreasonably apply clearly established law on double jeopardy.[1]

The double jeopardy claim is **DENIED**.

**Ineffective Assistance of Counsel Claims**

In Ground One and Ground Two, Garcia asserts that trial counsel deficiently performed by not moving to dismiss the counts in the information based on double jeopardy and by misadvising him to plead guilty. (Doc. 1 at 6, 8)

The state post-conviction court denied the ineffective assistance of counsel claims as follows (Doc. 8-6 at 8–12) (state court record citations omitted):

> . . . Defendant alleges ineffective assistance of counsel due to counsel's failure to file a motion to dismiss pursuant to rules 3.190(c) and 3.140(o). Specifically, he alleges the charging information violated his Fifth Amendment right against double jeopardy by pursuing [a] duplicitous prosecution charging Defendant with multiple counts of the same offense predicated upon a single criminal episode, contrary to the plain language of section 775.0847. He further alleges the charging information impinged on his right to effective assistance of counsel and fundamental fairness by arbitrarily manipulating the lowest permissible sentence and artificially inflating the sentencing scoresheet points to such an extent that counsel was left with no other ethical option but to recommend entry of a plea rather than proceed to trial and face life in prison. He alleges he asked his counsel about the State's tactic to charge him with so many reclassified counts of the same statute, all stemming from a single criminal episode. However, he alleges his counsel failed to follow up or even discuss a motion to dismiss or other challenges to such issues. He alleges counsel's deficient conduct allowed the

---

[1] At sentencing, the prosecutor introduced into evidence twenty separate images depicting child pornography, which corresponded to the twenty counts to which Garcia pleaded guilty. (Doc. 8-2 at 168–79) Also, a crime analyst testified that she analyzed the hard drive seized from Garcia's home and discovered 1,243 separate images of child pornography. (Doc. 8-2 at 208–09)

prosecution to maneuver the defense into an unconstitutional corner where Defendant's best choice was to enter a plea to duplicitous charges, thereby resulting in a fundamentally unfair sentence of thirty years' prison.

After reviewing the allegations, the court file, and the record, the Court finds Defendant's allegations are facially insufficient as he failed to allege prejudice. Normally, the Court would dismiss this claim without prejudice for Defendant to refile a facially sufficient claim. However, because Defendant cannot prove that his counsel acted deficiently or any resulting prejudice, it is unnecessary to do so.

Specifically, the Court finds, as previously discussed in [an earlier claim] above, on January 30, 2012, Defendant entered a plea based on negotiations with the State whereby Defendant agreed to enter the plea to twenty counts of possession of child pornography (ten or more images and content of images) (counts eighty-one through one hundred) with a thirty year prison cap, and in exchange, the State agreed to *nolle prosequi* eighty counts of possession of child pornography (ten or more images and content of images) (counts one through eighty). The Court finds Defendant asserts section 775.0847 required the State to charge the total number of images arising from the single criminal episode totaling ten or more as one single offense. Therefore, Defendant asserts he could not be convicted for more than one count of possession of child pornography (10 or more images) and the Court violated double jeopardy.

However, the Court finds section 827.071(5) states:

> It is unlawful for any person to knowingly possess a photograph, motion picture, exhibition, show, representation, or other presentation which, in whole or in part, he or she knows to include any sexual conduct by a child. The possession of each such photograph, motion picture, exhibition, show, representation, or presentation is a separate offense. Whoever violates this subsection is guilty of a felony of the third degree, punishable as provided in section 775.082, section 775.083, or section 775.084.

§ 827.071(5), Fla. Stat. (2009). Therefore, the Court finds this is not double jeopardy. The Court finds the State could have charged each of the 200 images as a separate count. The Court

finds as third-degree felonies, Defendant would have been facing up to 1000 years prison. The Court finds "[s]ection 775.0847 does not constrain the State's charging discretion." *Walsh v. State*, [ ] 2016 WL 833583 [at] *1 (Fla. 2d DCA Mar. 4, 2016). The Court finds "section 775.0847 allows the State to reclassify violations of section 827.071 to second-degree felonies if the offender possesses ten or more images and the content of at least one image contains at least one of the types of images listed in the statute." *Id.* Therefore, the Court finds when read together, both "statutes contemplate a possible separate charge for each image and allow for an upward reclassification if the number of images totals ten or more." *Id.* The Court finds section 775.0847 does not require the State to confine the charges to one offense per ten images in order to reclassify. The Court finds the State could have charged him with 200 second-degree felonies. The Court finds Defendant benefitted from the State charging only one offense for each group of ten images, thereby resulting in the scoring on Defendant's scoresheet of only twenty counts versus 100 third-degree felony counts. Therefore, the Court finds no double jeopardy violation occurred and the State did not arbitrarily manipulate the lowest permissible sentence or artificially inflate the sentencing scoresheet points by charging only one offense for each group of ten images. Consequently, the Court finds Defendant cannot prove that his counsel acted deficiently in failing to file the alleged motion to dismiss when counsel had no good faith basis to do so when no double jeopardy violation occurred, the State was within its discretion to charge only one offense for each group of ten images, and the State did not arbitrarily manipulate the lowest permissible sentence or artificially inflate the sentencing scoresheet points by charging only one offense for each group of ten images. The Court further finds even if his counsel had filed the alleged motion to dismiss, the motion would have been denied. As such, no relief is warranted [ ].

For the reasons stated above, Garcia's twenty convictions for possession of child pornography under Section 827.071(5), Florida Statutes, and twenty sentences enhanced under Section 775.0847(2) do not violate double jeopardy. Trial counsel did not deficiently perform by advising Garcia to plead guilty. Garcia faced one hundred counts of possession of child pornography, reclassified under Section 775.0847(2) as

second-degree felonies punishable by 15 years, for an aggregate sentence of 1500 years. (Doc. 8-2 at 2–84)   Trial counsel reasonably and competently negotiated a plea agreement under which Garcia agreed to plead guilty to twenty counts in exchange for the prosecutor's recommendation of a sentence no greater than thirty years. If trial counsel had instead moved to dismiss the counts based on double jeopardy, the motion would not have succeeded and likely would have jeopardized those negotiations. *Pinkney v. Sec'y, Dep't Corrs.*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").

Also, without a viable double jeopardy challenge, Garcia cannot demonstrate that he would have insisted on going to trial.   Garcia faced an aggregate sentence of 1500 years, faced overwhelming and inflammatory evidence of guilt, and presented no defense that he would have pursued if he had not pleaded guilty.   *Diveroli v. United States*, 803 F.3d 1258, 1265 (11th Cir. 2015); *Lynch v. Sec'y, Fla. Dep't Corrs.*, 776 F.3d 1209, 1218 (11th Cir. 2015).   Because Garcia failed to demonstrate a reasonable probability that he would not have pleaded guilty and would have insisted on going to trial, the state court did not unreasonably apply *Strickland*.   *Lee*, 137 S. Ct. at 1965 (quoting *Hill*, 474 U.S. at 59).

The ineffective assistance of counsel claims are **DENIED**.

Ground One and Ground Two are **DENIED**.

19

**Ground Three**

Garcia asserts that trial counsel was ineffective for not objecting at sentencing to the imposition of the consecutive fifteen-year sentences which he contends violates double jeopardy.   (Doc. 1 at 10)   The Respondent asserts that the ground is unexhausted and procedurally barred.  (Doc. 8 at 14–16)

Garcia raised this claim as ground three in his state post-conviction motion (Doc. 8-5 at 13–21), the post-conviction court summarily denied the claim (Doc. 8-6 at 11–12), and Garcia appealed.   In his brief on appeal, Garcia challenged the denial of ground one, ground two, and ground four in his post-conviction motion (Doc. 8-6 at 110–147) but failed to challenge the denial of ground three.  Because the post-conviction court denied relief after an evidentiary hearing on at least one claim, the state rules of procedure required Garcia to file an appellate brief and raise all issues that he intended to present in the brief.  Fla. R. App. P. 9.141(b)(3)(C).  Because Garcia failed to give the state court one full opportunity to resolve the claim in ground three by invoking one complete round of the state's established appellate review process, the ground is unexhausted.  *O'Sullivan*, 526 U.S. at 845.  If Garcia returned to state court to exhaust the claim, the post-conviction court would deny the claim as both untimely and successive.  Fla. R. Crim. P. 3.850(b), (h).  Consequently, the claim is procedurally defaulted.  *Snowden*, 135 F.3d at 736.  Because Garcia demonstrates neither cause and prejudice nor a miscarriage of justice to excuse the procedural default (Doc. 9 at 5–6), the claim is barred from federal review.  *Maples*, 565 U.S. at 280; *House*, 547 U.S. at 536–37.

Ground Three is denied.

**Ground Four**

Garcia asserts that trial counsel was ineffective for misadvising Garcia about his right to allocute at sentencing, for failing to object when the clerk swore in Garcia as a witness, and for failing to object to the prosecutor and the sentencing judge's "brutal" cross-examination of Garcia during sentencing.  (Doc. 1 at 12)  He contends the "brutal" cross-examination led the sentencing judge to consider impermissible factors when imposing an unusually severe sentence.  (Doc. 1 at 12)

The post-conviction court denied the claim as follows (Doc 8-6 at 83–94) (state court record citations omitted):

> . . . Defendant alleges ineffective assistance of counsel when counsel misadvised Defendant regarding his right to testify at the sentencing hearing. Specifically, he alleges his counsel allowed him to be sworn and subject to cross-examination after assuring Defendant he would not testify and knowing such would be contrary to his interests. He alleges his allocution and cross-examination at the sentencing hearing clearly resulted in an enhancement of his sentence beyond that which reasonably would have been expected had he not testified, thereby depriving Defendant of his right to a fair and impartial hearing and violating his due process. He alleges prior to the July 11, 2012, sentencing hearing, he and his counsel discussed the preparation of a short statement Defendant would make in addressing the Court prior to the imposition of his sentences.
>
> He alleges he was particularly concerned about avoiding cross-examination by the State as he felt that his counsel and witnesses would present an accurate portrayal of his persona. He alleges his counsel assured him that he would be able to simply read or recite his statement and sit back down as the State was prevented by law from asking questions of any kind. He alleges his counsel suggested some things he should mention to the Court and he prepared a statement he took with him to Court on the day of sentencing.

He alleges that at the sentencing hearing, he was but a few sentences into his statement when he was interrupted by the Court with a question specifically formulated to elicit an admission of guilt by Defendant. He alleges at the conclusion of his statement, the Court then asked Assistant State Attorney Ms. Rita Peters whether she had any questions. He alleges a cross-examination commenced consisting of a merciless "grilling" of Defendant by the State and the Court. He alleges his attempts to show that he was not a person with evil intent and that he had engaged in a misguided attempt at correcting his actions and redeeming himself backfired and resulted in detrimental mischaracterizations.

He alleges although his counsel attempted to intervene, the Court again interrupted with another series of questions in the same terse manner picking up where the State left off and further cross-examining him. He alleges during the State's final arguments, the State made a sustained series of sarcastic and derisive remarks about Defendant, offered personal unqualified opinions regarding [the] application of psychological tests, and made unsubstantiated allegations regarding Defendant's propensity to commit greater offenses in the future. He alleges none of this would have occurred had his counsel advised the Court of his right not to testify beyond his statement of "allocution" or had his counsel objected to the merciless cross-examination that occurred. He alleges he had no idea or expectation that he would be subject to such grueling examinations by the State and the Court. He alleges he relied on his counsel's very clear assurances that he would only be reciting his statement to the Court immediately before being sentenced.

He alleges his counsel failed to advise the Court of his choice not to testify and his choice to only make a brief statement of allocution. He alleges counsel's failure to halt the proceedings once it became clear that Defendant was being cross-examined under oath clearly prejudiced him by allowing the introduction and consideration of impermissible factors in denying a downward departure and imposing a harsher sentence.

In its prior order, the Court found Defendant's allegations were facially sufficient. The Court further found at the July 11, 2012, sentencing hearing, after an extensive hearing with witnesses, Defendant's counsel Mr. Arye Corbett stated, "Your Honor, Mr. Garcia would like to address the court." The Court found Defendant was then invited to the podium to address the Court. The Court found with notes in hand, Defendant then addressed

the Court. The Court found after his counsel asked him some questions, the Court allowed the State to ask him some questions. The Court found it was unable to conclusively refute his allegations that his counsel misadvised him that his actions of giving a prepared statement at the sentencing hearing did not constitute him testifying and would not subject him to cross-examination. Therefore, the Court ordered the State to respond to [the claim].

In its response, the State asserted while it did not concede any error on the part of Defendant's counsel, a review of the motion, files, and record in this case did not conclusively refute his allegations. The State asserted because this claim involved attorney/client communications and could not be refuted by the record, this claim should be addressed at an evidentiary hearing. After reviewing the allegations, the State's response, the court file, and the record, the Court found Defendant was entitled to an evidentiary hearing on [the claim].

At the evidentiary hearing, Defendant admitted he was charged with possession of a hundred images of child pornography and hired Guy Fronstin to represent him. He testified there was no way he would consider going to trial on this case. He testified he knew the State had evidence so he was just trying to get Mr. Fronstin to work out a plea deal. He testified he received a thirty-year prison plea offer from the State, but he rejected that offer.

He testified Mr. Fronstin advised him that he had done some investigating and the best course of action was to enter an open plea to the Court because Judge Tharpe was a fair judge. He testified Mr. Fronstin advised him the maximum sentence was 300 years' prison because there were twenty counts carrying a maximum of fifteen years' prison. When asked if he explained to him the lowest permissible sentence, he responded, "I don't recall. In the Hillsborough County case, discussing the lowest permissible. I do recall very close to the plea colloquy, that he sent an e-mail to my wife and he mentioned that there was a possibility that I would get 15 years."

He admitted Mr. Fronstin discussed with him obtaining a downward departure and what he would have to show to justify a downward departure, including his character, reputation, and a diagnosis requiring treatment. He testified he told Mr. Fronstin that he wanted to make a statement to the Court. When asked what discussion, if any, was had regarding whether or not the

State and the judge could cross-examine him, he responded as follows:

> Garcia: That was my primary concern; that I wanted to have a pre-prepared statement to make to the Court, to appeal to the Court's leniency, to — I wanted to provide the Court some perspectives besides the binary guilt or not guilt that came with the plea, I wanted to frame my situation within that spectrum of not being, you know, the alleged, you know, evil person that was maliciously looking to hurt — to hurt children. I wanted to give the Court some information about myself and my background, my family, the situation that went on.

He admitted that he wrote out a statement and attempted to read it to the judge. He further testified as follows:

> Garcia: I wanted the Judge to know that I was someone who had led a life, a righteous life. I was not a person that was involved in any type of lewdness and that recently came, you know, came in touch and downloaded child pornography. And that I quickly reacted and decided to stop doing that. And so, that's one part of what I wanted to say, that I still went ahead and said because it was the truth, that my attorney told me not to say that, you know, that I was trying to redeem myself, by collecting evidence and turning it over to law enforcement.

He admitted he wanted the judge to know he was remorseful for his actions. He testified he made it worse because he started to tell the judge about his proactive investigation to collect evidence on others, that he was sorry for what he did, that he despises it today, and that he had a loving family, circle of friends, and community relationships. However, he testified it backfired because the judge interrupted him in a hostile manner, took a prosecutorial stance, and became angry. He testified after the judge basically cross-examined him, the prosecutor Ms. Peters was allowed to question him.

He testified his counsel's failure to object to the cross-examination and not preparing him to be cross-examined opened a gateway to a number of things, including allowing the State to make a number of unsubstantiated allegations which the judge relied on. He testified he believed the whole tone and demeanor of the sentencing hearing changed from that point forward once he made his statement. He testified Mr. Fronstin advised him that he should not make a statement to the Court because it would be counterproductive. He testified the judge also made statements lumping him in with a group of people he referred to as "The Dark Side," derided his character witnesses who were present at the sentencing hearing, and said he was dangerous.

He testified that if his counsel had advised him that he would be subject to questioning by the Court and State at his sentencing hearing, he would not have testified.

When asked how not testifying would have affected his sentence, he responded as follows:

> Garcia:   Well, not testifying would have left it what I would consider, you know, the state that it was before I made my statements, which was, you know, in fact, you know based on the e-mail that Mr. Fronstin sent my wife, I was fully expecting to get somewhere around 15 years. I believe that the turning point was my statement ordered the whole — the whole mood of the hearing changed. The Court was leading the pace of just acting extremely harsh, and cynical, and accusatory and everything I said there was a counterpoint to make or something to undermine it.

On cross-examination, when asked what specifically he was alleging against attorney Arye Corbett, Defendant responded, "I don't think he did anything ineffective. He basically did share with Fronstin the night before, at 11:00 p.m., when we met and telling me that I could — that I could actually make my statement, my pre-prepared statement . . . . And not be cross-examined." He testified that Mr. Corbett agreed with Mr. Fronstin's advice to him not to mention that he was collecting evidence. He admitted that Mr. Fronstin and Mr. Corbett advised him that he would be able to give a prepared statement

without being cross-examined and both advised him not to tell the Court that he was doing his own investigation and collecting evidence to turn over to law enforcement.

He testified the questions the Court asked him were very accusatory in nature and very terse in tone. He admitted the Court allowed him to make the prepared statement in its entirety and Mr. Fronstin followed up with some questions.

At the same hearing, Mr. Guy Fronstin testified he represented Defendant. He testified, "I was contacted either by Mr. Garcia from the jail or his wife, I don't remember; that he was in the Palm Beach County Jail at that time, being held and he had two cases pending. One in Palm Beach County and one in Tampa." He testified the cases were related because the Hillsborough County case was the possession of child pornography and the Palm Beach County case was the transmission from Hillsborough County to Palm Beach County of that child pornography. He testified he felt the State had a very strong case against him.

He testified Mr. Corbett assisted with this case. He testified after some heavy negotiations, the State *nolle prossed* eighty counts and Defendant entered an open plea to twenty counts. When asked if he ever told Defendant that he had checked around and found that Judge Tharpe was lenient or very fair, he responded, "I don't ever remember using the word 'lenient.' I do — did — I do recall that, you know, definitely checked around and heard that he was fair, that he would hear the whole side, and make his decision and give us a fair hearing."

He admitted he discussed the maximum penalties with Defendant, including the number of counts and how much time he could get for each count, the cap of thirty years' prison, the *nolle prossing* of some counts, and that they could run the sentences consecutively. However, he testified that he probably told Defendant or his wife that it was possible he could receive fifteen years' prison. When asked about the context of which he would throw out a number like fifteen years, he responded as follows:

> Fronstin:  . . . I was hopeful that with our presentation and Mr. Garcia had a tremendous support network that was showing up at every hearing and that they would be testifying and lots of letters, we were hopeful that it

26

would, you know, be a lot less than what
the State was asking for. So that's why I
probably might have said, the number 15.

He testified he definitely remembers discussing with Defendant
whether or not he would testify at the sentencing hearing. He
testified, "I remember discussing that he could prepare his own
statement to give to the Court. And that was the approach that
was going to be taken." When asked whether he recalled
discussing with him whether or not the Court or the State would
be able to ask him questions, he responded as follows:

Fronstin:    I don't specifically recall telling him —
             discussing whether the State would ask
             him questions, but I do know from my
             entire career, that that is absolutely
             something I'm aware of and as a standard,
             I've always advised as a prosecutor, my
             victims and as a defense attorney, my
             defendants, clients and I would know for a
             fact that if — I definitely would never have
             said you will not be asked questions.

He denied ever telling Defendant that he would be able to read a
prepared statement and then sit back down. He testified he knew
about the content of Defendant's statement, but never read it in
advance.

However, he denied that Defendant ever expressed to him a
concern about avoiding cross-examination by the State. He also
testified, "I know for a fact I never would have said, the State
will not be allowed to ask you questions." He testified he went
over everything on the plea form with Defendant more than
once. He testified he recalled discussing with Defendant that
Defendant wanted the Court to know that he was gathering
information about child pornography to turn it in to law
enforcement, but advised Defendant not to do so because they
do not believe it, it is upsetting to them, and you will lose
credibility.

On cross-examination, he testified he spoke to local Assistant
State Attorneys and defense attorneys and they told him that
Judge Tharpe would give him a fair hearing, but he is tough on
sentencing. When asked if he advised Defendant that Judge
Tharpe was tough on sentencing, he responded, "I don't
remember if I told him that or not. I do know that this — he had

[a] gory case to present at sentencing, so I might — Mr. Garcia did, so I might not have said he's tough on sentencing. With all my clients over the years [he had] a very — very good mitigation case for sentencing." He admitted to negotiating the thirty-year cap with the State.

He admitted that Defendant had a lot of mitigation for purposes of sentencing and he was attempting to get a downward departure. When asked about the statutory mitigating factors he had to present to the Court, he responded as follows:

> Fronstin:   Well, primarily, we did have a full battery psychological testing done. Unfortunately, at the end, there really wasn't, under the statute, an opening for the downward departure. So at that point we looked at — I've never had a client that had so much community support in all my years. They filled this courtroom at every hearing, even in Palm Beach County. And they gave incredible letters and statements. And, also, the family and so forth. So I think, legally, unfortunately at the end of the case, we were able to really present a great — a statutory option for a downward departure.

When asked if he reviewed what Defendant had written in his statement, he responded as follows:

> Fronstin:   I don't believe I read it. I just believe we discussed what he was going to say, but I don't — I may have read it, but I don't recall reading the statement. I don't recall him reading it to me in advance. I just know that we spent a lot of time talking about what he would say to the Court. He's a very, very, bright man. I was very comfortable with him speaking to the Court.

He admitted that he thought Defendant addressing the Court would be helpful in getting a reduced sentence. He denied reviewing with him any potential cross-examination questions the State may have for him. On redirect examination, Mr. Fronstin admitted that Mr. Corbett made an argument at the sentencing hearing for a downward departure.

Mr. Arye Corbett testified he represented Defendant in July of 2012. He testified, "[m]y limited recollection was discussions regarding his desire to address the Court at the sentencing hearing." When asked if he recalled personally ever giving him any advice indicating that he would simply be able to read a prepared statement and sit back down, he responded, "[n]o, nor do I remember that being discussed. I wouldn't have taken the lead on that advice, as I was pretty new to the firm, as well as new to that case and had not that (indiscernible) previously . . . . But I was present during the discussions, but I don't recall that discussion."

He denied ever telling Defendant that he could avoid cross-examination by reading a prepared statement and denied telling him that the State and the Court would not be able to ask him questions if he read his prepared statement. He recalled Defendant indicating to him that he wanted to tell the Court that he was collecting child pornography in an effort to turn it over to law enforcement. When asked whether or not he personally advised him whether or not that was a good idea, he responded, "I don't know that it was me, personally, but I remember generally, a discussion about being — that, you know, every criminal defense — every criminal defendant accused of such a crime uses that as an excuse and that would probably not be in his best interest to take that approach if you were giving a statement and used that as an excuse for why he was engaging in the conduct." He admitted he recalled arguing for a downward departure on the basis that he suffered from pedophilia as a mental illness and was amenable to treatment.

After reviewing the allegations, the testimony, evidence, and arguments presented at the January 23, 2017, evidentiary hearing, the court file, and the record, the Court finds Mr. Fronstin's and Mr. Corbett's testimony to be more credible than that of Defendant. The Court finds neither Mr. Fronstin nor Mr. Corbett assured Defendant he would not testify. The Court finds neither Mr. Fronstin nor Mr. Corbett assured Defendant that he would be able to simply read or recite his statement and sit back down as the State was prevented by law from asking questions of any kind. The Court finds Mr. Fronstin and Mr. Corbett advised Defendant not to mention that he was collecting evidence of child pornography to turn over to law enforcement, but Defendant against their advice, included such in his statement to the Court.

The Court finds even if counsel had made the alleged objection
to the State or the Court's questioning of him, the objection
would have been overruled. The Court further finds neither Mr.
Fronstin nor Mr. Corbett had any good faith basis to make the
alleged objection as the State and Court are allowed to question
Defendant at the sentencing hearing after he entered the plea.
The Court finds even if his counsel had advised the Court of
Defendant's choice not to testify and his choice to only make a
brief statement of allocution, the Court still would have asked
questions of Defendant and allowed the State to do so.

The Court finds it is not sure whether Mr. Fronstin and Mr.
Corbett had a full appreciation for the habits of the sentencing
judge. The Court finds as a sentencing judge, the whole point of
the plea is for Defendant to take responsibility for his actions.
The Court finds when a defendant is not doing that, it
undermines the whole process. The Court finds against their
advice, Defendant chose to include in his statement that he was
gathering evidence of child pornography to turn over to law
enforcement. The Court finds Defendant's actions to include
that in his statement was as much of a contributing factor which
led to the resulting sentence as any alleged cross-examination by
the State or the Court. Consequently, the Court finds Defendant
failed to prove that Mr. Fronstin or Mr. Corbett acted deficiently
or any resulting prejudice. As such, no relief is warranted upon
[the claim].

The post-conviction court found trial counsel more credible than Garcia at the
evidentiary hearing (Doc. 8-6 at 93), and a state court's credibility determination
receives deference in federal court. *Nejad v. Att'y Gen., State of Ga.*, 830 F.3d 1280, 1292
(11th Cir. 2016).

At the evidentiary hearing, Guy Fronstin testified that he represented Garcia
and negotiated the agreement with the prosecutor. (Doc. 8-6 at 57–59) The prosecutor
agreed to both recommend a sentence no greater than thirty years and dismiss eighty
of the one hundred counts. (Doc. 8-6 at 57–59) Fronstin told Garcia that the
sentencing judge was fair and advised that a sentence of fifteen years was possible

because a "tremendous support network" of family and friends would testify and submit letters at the sentencing hearing.  (Doc. 8-6 at 59)

Concerning the allocution, Fronstin denied that he advised Garcia that the sentencing judge and the prosecutor could not ask Garcia questions (Doc. 8-6 at 59–60):

|  |  |
|---|---|
| [Prosecutor:] | . . . In his motion for post-conviction, [Garcia] alleges that you allowed him to be sworn and subjected to cross-examination after assuring him that he would not have to testify, knowing such would be contrary to his interest. Do you remember discussing with him whether or not he would testify at the sentencing hearing? |
| [Fronstin:] | I definitely remember discussing that. |
| [Prosecutor:] | Do you recall if the discussion was around whether or not he could make a prepared statement or if he would have to testify? |
| [Fronstin:] | I remember discussing that he could prepare his own statement to give to the Court. And that was the approach that was going to be taken. |
| [Prosecutor:] | Do you recall discussing with him whether or not the Court or the State would be able to ask him questions? |
| [Fronstin:] | I don't specifically recall telling him — discussing whether the State would ask him questions, but I do know from my entire career, that this is absolutely something I'm aware of and as a standard, I've always advised as a prosecutor, my victims[,] and as a defense attorney, my defendants, clients and I would know for a fact that if — I definitely would never have said you will not be asked questions. |

| [Prosecutor:] | Would you have told Mr. Garcia that he would be able to simply read a prepared statement and then sit back down? |
| [Fronstin:] | No, [I] definitely would not have said that. |
| . . . | |
| [Prosecutor:] | Did he ever voice a concern to you about avoiding cross-examination by the State or Ms. Peters? |
| [Fronstin:] | Not that I recall. |
| [Prosecutor:] | Are you confident that you never told him that the State would not be allowed to ask him questions? |
| [Fronstin:] | I — I know for a fact I never would have said, the State will not be allowed to ask you questions. |

Fronstin reviewed the change of plea form with Garcia. (Doc. 8-2 at 61) By signing the change of plea form, Garcia agreed: "I understand if I plead guilty or *nolo contendere* the judge may ask me questions about the charge(s) to which I have just pled . . . ." (Doc. 8-2 at 88) Fronstin advised Garcia not to tell the sentencing judge that Garcia had collected child pornography to turn over to law enforcement. (Doc. 8-6 at 62) Fronstin explained to Garcia that many defendants provide that excuse, and the sentencing judge would become upset. (Doc. 8-6 at 63) Fronstin advised Garcia: "I highly recommend that you don't go down that road, because you'll lose all credibility." (Doc. 8-6 at 63–64)

Arye testified and denied that he ever advised Garcia that he could read a prepared statement at the sentencing hearing without cross-examination (Doc. 8-6 at 74–75):

| [Prosecutor:] | And do you recall having any discussions with [Garcia] and Mr. Fronstin as well, regarding the sentencing hearing, as to whether or not he should testify? |
|---|---|
| [Arye:] | My limited recollection was discussions regarding his desire to address the Court at a sentencing hearing. |
| [Prosecutor:] | Do you recall personally ever giving him any advice indicating that he would simply be able to read a prepared statement and then sit back down? |
| [Arye:] | No, nor do I remember that being discussed. I wouldn't have taken the lead on that advice, as I was pretty new to the firm, as well as new to that case and had not that (indiscernible) previously. |
| [Prosecutor:] | Okay. |
| [Arye:] | But I was present during the discussions, but I don't recall that discussion. |
| [Prosecutor:] | Do you recall personally ever telling him that he could avoid cross-examination by reading a prepared statement? |
| [Arye:] | No. |
| [Prosecutor:] | Do you recall ever telling him that [neither] the State, nor the Court would be able to ask him any questions if he read his prepared statement? |
| [Arye:] | No. |

Arye remembered that the defense team discussed with Garcia his plan to tell the sentencing judge that he collected child pornography to turn over to law enforcement. (Doc. 8-6 at 75) The defense team advised Garcia: "[E]very criminal defendant accused of such a crime uses that as an excuse and that would probably not be in his best interest to take that approach if [he] were giving a statement and used that as an excuse for why he was engaging in the conduct." (Doc. 8-6 at 75)

Both Fronstin and Ayre denied that they advised Garcia that he could allocute without suffering cross-examination by the prosecutor and the sentencing judge. The post-conviction court found Garcia's testimony to the contrary not credible, and Garcia fails to come forward with clear and convincing evidence to rebut that determination. 28 U.S.C. § 2254(e).

Garcia testified and agreed that trial counsel told him that his statement concerning his intention to cooperate with law enforcement would be "counterproductive" and advised "[t]hat [he] shouldn't do it." (Doc. 8-6 at 45) Garcia agreed that the sentencing judge would not have become hostile and sentenced him so harshly if Garcia had not told the sentencing judge that he collected the child pornography for law enforcement. (Doc. 8-6 at 52–53)

At the sentencing hearing, after hearing testimony by witnesses including a detective who described the images depicting child pornography found on Garcia's computer and who described statements that Garcia made to an undercover police officer on the internet about engaging in sex with children while trading child pornography, the sentencing judge allowed Garcia to allocute. (Doc. 8-2 at 216–20)

34

Garcia told the sentencing judge that he was "deeply sorry and remorseful for getting involved in child pornography." (Doc. 8-2 at 220)  The sentencing judge interrupted Garcia and asked him, "For doing what?" (Doc. 8-2 at 220)  Garcia clarified, "For downloading child pornography, okay?" (Doc. 8-2 at 220) The sentencing judge allowed Garcia to allocute without further interruption until he completed his statement. (Doc. 8-2 at 220–29)  Garcia told the sentencing judge (Doc. 8-2 at 225):

> [Garcia:]     When I realized what I had gotten myself into, Your Honor, around my house, there is more than two — I think more than three law enforcement officers and detectives that live in my neighborhood. In my mind, however   misguided, and against my counsel's advice to say this, but I have to say it because it is the truth in my heart, and may God strike me down if it's not, I decided, as misguided and stupid as that was, to start collecting evidence on these people and started — you know, and I've been told this is the most common excuse that people that deal in child pornography do, but it's a reality in my case.
>
> I left — you know, if they looked, they found — there's a software called Tiger Shark that logs IP addresses and whenever there are sessions and chats going on, that logs — gets the IP, and I was trying to get IPs of people I was chatting with, okay?
>
> So I'm not accusing myself, and I'm not saying that I didn't upload this, and I didn't get sucked into this, but the other behavior that, you know, pains me as someone seeking out, you know, children, the chats will show that every time, you know, the lieutenant or the name of the person that was down South tried to get me to go

> somewhere, all I would do is ask him to tell me where he was because my objective was to call my next-door neighbor and say, look, there is a guy here who is actually abusing a child, okay?

The sentencing judge allowed trial counsel to ask Garcia questions (Doc. 8-2 at 229–30) and then allowed the prosecutor to ask Garcia questions.  (Doc. 8-2 at 230–33)   The prosecutor confronted Garcia about his failure to contact law enforcement and report the crimes long before he was arrested.  (Doc. 8-2 at 230–33)  After the prosecutor finished cross-examination of Garcia, Garcia interjected (Doc. 8-2 at 233):

| [Garcia:] | I would never hurt my child. Okay. Whatever I said was under that, you know, trying to get people to believe I was really somebody who I was not. |
|---|---|
| | And as I said, Your Honor I — you know, I just had to say that I know that it may be detrimental to me. I am going to get ridiculed, but it is what it is, and I tell you that in front of God and looking at you in the eyes. I have a problem, and I need help; but I tell you when I did that, I was doing it because I wanted to save and track and save logs of who I was talking to, to try to find the IP, and then later on with an IP, try to find who these people were. |
| [Court:] | Say that one more time. With an IP do what? |
| [Garcia:] | With an IP, you can find out a general vicinity of where someone is. |

The sentencing judge then asked Garcia open-ended questions about the statements that Garcia made on the internet to the undercover police officer (Doc. 8-2 at 234–35):

| [Court:] | Why would you talk about your son in these chats? |
|---|---|
| [Garcia:] | I don't remember if the person asked or not. |
| [Court:] | What? |
| [Garcia:] | I don't remember if the person asked or not. |
| [Court:] | You don't want me to read it in front of all of these people. We know what we're talking about. You don't need me to read it in front of all of these people. Why would you talk about your son? |
| [Garcia:] | Because I was an idiot. |
| [Court:] | How can there not be? How can there not be malice? |
| [Garcia:] | There isn't, Your Honor. |
| [Court:] | Okay. All right. All right. I don't have anything else for your client. |

The sentencing judge heard argument by trial counsel, including a motion for a downward departure based on Garcia's need for specialized treatment as a diagnosed pedophile, and the prosecutor's response. (Doc. 8-2 at 235–52)  In response to results from a polygraph examination presented by trial counsel, the prosecutor pointed out that the polygraph examiner did not ask Garcia whether he intended to meet a minor to have sex and whether he intended to have sex with a child. (Doc. 8-2 at 249–50)

After the prosecutor finished her response, Garcia interjected and the following exchange between the sentencing judge and Garcia ensued (Doc. 8-2 at 252–54):

| | |
|---|---|
| [Garcia:] | Your Honor, may I say something? |
| [Court:] | Absolutely. |
| [Garcia:] | [The prosecutor] mentioned two questions on a polygraph. I wouldn't have a problem taking those questions. |
| [Court:] | It doesn't make a difference right now. You know this as well as I know, Mr. Garcia, there are programs that are used primarily by law enforcement, but if you are technologically advanced, as you say that you are, you have the ability to look at IP addresses, and as you stated, find out what the locations are or the area of proximity of where those IP addresses are located. Law enforcement does that for the purposes of locating a particular address where a computer is located where, for lack of a better term, where it lives, where it is, so that they can then get a physical address and execute a search warrant. |
| | If you are technologically advanced, as you may be, and you have that IP address, and I'm not sure what type of business you were in, a communication business or something — |
| [Garcia:] | Consulting and telecommunications. |
| [Court:] | Telecommunications, you may also have the ability, based upon having an IP address, of locating that particular computer. And if you do, then you also have the ability of locating the person that is using that computer and exchanging chat ideas [and] child pornography with you. |

| | |
|---|---|
| | That — I'm not saying that you were going to do that, but it's within the realm of possibility. |
| [Garcia:] | I understand. |

The sentencing judge continued to provide an explanation before imposing a sentence.  Garcia interjected a second time when the sentencing judge commented that the statements that Garcia made about his own son were disturbing (Doc. 8-2 at 256–57):

| | |
|---|---|
| [Court:] | I'm going to tell you something that is even more disturbing than that, the comments that you made about your own son, about your son. |
| [Garcia:] | They're not real. |
| [Court:] | About your wife. You fantasize about that, Mr. Garcia. If you didn't fantasize about it, you wouldn't say it. |
| [Garcia:] | Your Honor, I was — |
| [Court:] | My God. My God. Mr. Garcia, how, how in the world can a man who loves his family and his child so much talk with a stranger about having sex with him. How do you do that? |
| [Garcia:] | You don't. |
| [Court:] | You did it. |
| [Garcia:] | I'm sorry, but it was in a different character. It was in a different setting. They don't know. I would never, ever do that, Your Honor. |
| [Court:] | You should have taken your attorney's advice. When you tell me you downloaded and you started keeping evidence and all of that to give to law enforcement — |

| | |
|---|---|
| [Garcia:] | That wasn't the primary. I told you that is what I did afterwards. |
| [Court:] | Well, you're caught. You're caught. When were you going to do it? |
| [Garcia:] | Your Honor, I was going — |
| [Court:] | When? |
| [Garcia:] | Please believe me. |
| [Court:] | How soon, Mr. Garcia? How soon were you going to do it? |
| [Garcia:] | I was not doing it one-hundred percent of the time. |
| [Court:] | When you were going to go to your neighbor, Mr. Garcia, instead of calling the FBI or someone else, getting on the telephone? Why are you going to go to your neighbor, Mr. Garcia? It doesn't make sense. I have a responsibility — |
| [Garcia:] | I was, the week that I was arrested, sir. |
| [Court:] | Listen. |
| [Garcia:] | Sorry. Sorry. |
| [Court:] | Listen, it doesn't make any difference at this point. I have a responsibility to protect the children. You're dangerous. You are dangerous. |

The sentencing judge sentenced Garcia to the aggregate thirty-year sentence for the twenty counts. (Doc. 8-2 at 258)

Fronstin and Ayre denied that they advised Garcia that he could allocute without suffering cross-examination by the prosecutor and the sentencing judge. During sentencing, the defense moved for a downward departure for Garcia's need for

specialized treatment as a diagnosed pedophile.  § 921.0026(2)(d), Fla. Stat.  (Doc. 8-2 at 242–45)  When a defendant moves for a downward departure, the sentencing judge determines whether it legally can depart and whether it should depart.  *Banks v. State*, 732 So. 2d 1065, 1067–68 (Fla. 1999).  Competent substantial evidence must support the trial court's ruling.  *Banks*, 732 So. 2d at 1067.

Because the defense presented Garcia's allocution and moved for a downward departure, the sentencing judge appropriately directed the clerk to swear in Garcia and permitted cross-examination of Garcia like any other witness.  The prosecutor and sentencing judge's cross-examination concerned topics relevant to whether the sentencing judge should have departed.  Even if trial counsel had objected to the cross-examination, the sentencing judge would have overruled the objection.  Consequently, trial counsel was not ineffective.  *Pinkney*, 876 F.3d at 1297.  *Jean-Baptiste v. State*, 155 So. 3d 1237, 1242 (Fla. 4th DCA 2015) ("[B]ecause Jean–Baptiste offered his statement in the context of a sentencing hearing which included the introduction of evidence in support of Jean–Baptiste's motion for downward departure, the trial court did not err in requiring Jean–Baptiste to be sworn and subject to cross-examination."); *Compere v. State*, 262 So. 3d 819, 823 (Fla. 4th DCA 2019) ("The blurred lines on when the State may cross-examine the defendant have resulted from instances in which the trial court hears the defendant's allocution at the same time as the evidence in support of a downward departure motion. Then, the defendant is sworn (for the purposes of the motion), but also speaks to the court as part of the allocution while sworn.").

The most devastating questioning occurred when Garcia interrupted the sentencing judge just before the pronouncement of his sentence. During this exchange, the sentencing judge responded to Garcia's explanation that he downloaded the child pornography to assist law enforcement and his final, unsolicited pleas for mercy. Because trial counsel specifically advised Garcia not to present that explanation, the state court did not unreasonably apply *Strickland*.

Ground Four is **DENIED**.

It is therefore **ORDERED**:

1.      The petition for the writ of habeas corpus (Doc. 1) is **DENIED**.

2.      The Clerk shall enter judgment against Garcia and close this case.

3.      Garcia neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000). Consequently, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**.

**DONE AND ORDERED** in Tampa, Florida this 21st day of March, 2022.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

All parties of record including unrepresented parties, if any